Sidney B. Lifschultz and Charlotte Lifschultz v. Commissioner.
Lifschultz v. Commissioner
Docket No. 998-62.
United States Tax Court
T.C. Memo 1966-225; 1966 Tax Ct. Memo LEXIS 58; 25 T.C.M. (CCH) 1146; T.C.M. (RIA) 66225; October 12, 1966
*58 Held, that sums which petitioner Sidney Lifschultz paid in each of 5 transactions involving various issues of Treasury bonds, purportedly as "prepaid interest" on 5 newly created items of "indebtedness," did not in substance and reality constitute interest on indebtdeness within the intendment of section 163(a), 1954 Code, and, therefore, the respective payments in 1955 and 1956 are not deductible. M. James Spitzer and Allan M. Seif, 595 Madison Ave., New York, N. Y., for the petitioners. Robert D. Whoriskey and Lionel Savadove, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: Respondent determined deficiencies in income tax for the years 1955 and 1956 in the amounts of $55,358.90 and $90,359.55, *59 respectively. The question is whether the petitioner, Sidney B. Lifschultz, is entitled to a deduction in each year under section 163(a), 1954 Code, as interest paid on indebtedness, of $36,241.25 in 1955, and $78,866.08 in 1956. The parties have entered into stipulations that dispose of several determinations of the respondent, which will be given effect in computations to be made under Rule 50. Findings of Fact The facts that have been stipulated are found accordingly. The stipulations of facts and the accompanying exhibits are incorporated herein by reference. [1]
The petitioners, residents of New York City, New York, filed joint returns for the taxable years with the district director of internal revenue, Manhattan District, in New York City. They reported income for each calendar year on the basis of the cash receipts and disbursements method of accounting. The issue for decision relates to a series of 5 transactions of Sidney B. Lifschultz relating to United States Treasury Bonds. He is referred to herein *60 as the petitioner. In the joint return for each of the years 1955 and 1956, the petitioner deducted as interest paid on indebtedness $36,241.25 and $78,866.08, respectively. The respondent disallowed the deductions for the following reasons, set forth in the statutory notice of deficiency: It has been determined that the payments for prepaid interest in the respective amounts of $36,241.25 and $78,866.08 for the taxable years ended December 31, 1955 and December 31, 1956, relating to the alleged purchases of U.S. Treasury Notes for the items shown below, do not represent allowable deductions for interest on indebtedness within the purview of section 163 of the Internal Revenue Code of 1954. November 14, 1955 - 500M U.S. Treasury Notes 2 7/8%, March 15, 1957 with March 15, 1956 and September 15, 1956 coupons detached November 22, 1955 - 250M U.S. Treasury Notes 2 7/8%, March 15, 1957 with March 15, 1956 and September 15, 1956 coupons detached April 11, 1956 - 500M U.S. Treasury Notes 2 7/8%, June 15, 1958 with June 15, 1956 and December 15, 1956 coupons detached October 4, 1956 - 500M U.S. Treasury Notes 1 1/2%, April 1, 1958. December 13, 1956 - *61 1000M U.S. Treasury Notes 1 7/8%, February 15, 1959 General Facts Petitioner, who is over 52 years of age, is the president of Arrow Freight Forwarders, Inc., the managing partner of Lifschultz Fast Freight (the sixth largest forwarder of freight in the United States), the president of several other corporations, and a director of additional corporations. He is a graduate of the University of Illinois, where he received the master's degree in business administration from the Graduate School of Business Administration. During the taxable years 1955 and 1956, petitioner's net worth was in excess of $1,000,000. He maintained substantial balances with New York banks, and he had substantial amounts of securities and other liquid assets. For about one year, in 1959, he was a limited partner in D. H. Blair & Co., Inc., a money brokerage concern, after it had become a member of the New York Stock Exchange. On a continuing basis, he keeps abreast tax laws and subscribes to several tax services in connection with the handling of his personal finances and the operations of his business interests. Before, during, and after 1955 and 1956, petitioner made large purchases and sales of securities *62 for the respective accounts of himself, his relations, pension funds, and trusts. One of his accounts was with Ira Haupt & Co., a broker and dealer in securities with offices in New York City, in which over $300,000 of securities were deposited in 1955 and 1956. Hyman L. Federman, employed by Haupt & Co., handled petitioner's account with Haupt. None of those transactions are involved here. Millridge Corporation, organized on May 5, 1955, under New York laws, is a dealer in securities and has its office at 29 Broadway, New York City. In 1955 and 1956, the stock of Millridge was owned by Robert W. Miller, 50 percent; Hyman L. Federman (associated with Ira Haupt & Co.), 25 percent; and Harry Janin (a certified public accountant), 25 percent. Kenneth Blair Ortmann was president of Millridge during the period involved here. Millridge keeps its books and reports income on the basis of a fiscal year ending on October 31. Millridge filed an income tax return for the period May 5 to October 31, 1955, but reported no taxable income and no earned surplus; and in Schedule L, it reported that it did not have any assets and no cash on hand, and no liabilities at the beginning and the end of *63 the taxable period. Millridge filed an income tax return for the period November 1, 1955, through October 31, 1956, in which it reported a net operating loss of $12,058.15. In Schedule L of the return, it reported as of November 1, 1955, no assets, and no liabilities; and it reported capital stock (common) in the amount of $5,000. It reported as of October 31, 1956, cash on hand of $725, and that notes and accounts receivable of $3,048,495.31 were offset by accounts, notes, bonds, and mortgages payable of $3,056,278.46. According to its books of account, the cash receipts and disbursements of Millridge from November 1 to December 31, 1955 were as follows, the details being set forth below: Cash receipts
$165,597.09
Cash disbursements
130,711.47
Excess of receipts
$ 34,885.62
1955
Cash Receipts
Amounts
Nov. 14
Sidney Lifschultz, No. 1
$ 23,301.37
14
David Brown
23,301.37
16
Blair & Co.
5,000.00
22
Sidney Lifschultz, No. 2
12,939.88
22
Blair & Co.
1,000.00
25
Merill Brown
12,962.77
25
Conrad Grossman
12,962.77
Dec. 12
Robert Levy
28,654.16
22
Harry Janin
9,487.97
27
Barry Federman
21,662.27
29
Henry Sonnenberg
14,324.53
$165,597.09
Cash Disbursements
Nov. 16
First Seneca Bank
$ 15,944.37
16
Haupt & Co.
24,914.79
21
Blair & Co.
250.00
22
First Seneca Bank
3,887.08
22
Haupt & Co.
6,350.53
25
Haupt & Co.
12,961.88
25
Nat'l Security Bank
7,788.02
28
Nat'l Security Bank
81.98
Dec. 2
16.48
13
8,728.14
13
Haupt & Co.
14,296.02
27
Sartorius
25,250.00
29
Sartorius
10,000.00
22
229.68
22
Chase Bank
12.50
$130,711.47
*64 From November 1 to December 31, 1955, the bond purchases of Millridge exceeded its bond sales by $115,281.68 as follows: Purchases, cost
$ 3,402,851.57
Plus interest
19,956.04
$3,422,807.61
Sales
3,307,525.93
Difference (excess)
$ 115,281.68
D. H. Blair & Co., Inc., had its offices at 29 Broadway, New York City in the taxable years. Robert W. Miller was its president and sole stockholder in 1955 and 1956. At some time during the years 1955-1956, Blair & Co. acquired Miller's 50 percent ownership of stock of Millridge. Blair & Co. is a money broker. During the period involved here, Millridge and Blair carried on their operations in the same office and used the same clerical personnel. Ortmann, the president of Millridge, was the bookkeeper of Blair. Harry Janin (who owned 25 percent of the stock of Millridge) is a certified public accountant and a partner in the accounting firm of Eisner & Lubin. He was the accountant of Millridge during the relevant years. Hyman L. Federman, petitioner's broker at the Ira Haupt Company, brought about petitioner's contact with Millridge. The issue here relates to 5 transactions, or deals, in United States Treasury bonds *65 in different series in the total face amount of $2,750,000. The following schedule lists the principal amount of the bonds involved in each transaction, and the respective dates of the issuance by the Treasury and the maturity dates: Series, Inter-
Treasury Is-
Deals in
Deal
est Rates
sue Dates
Due Dates
Issue
1 - 1955
2 7/8
9/15/53
3/15/57
$ 500,000
2 - 1955
2 7/8
9/15/53
3/15/57
250,000
3 - 1956
2 7/8
12/ 1/55
6/15/58
500,000
4 - 1956
1 1/2
4/ 1/55
4/ 1/58
500,000
5 - 1956
1 7/8
5/17/55
2/15/59
1,000,000
Total face amount
$2,750,000
The first, second, fourth, and fifth transactions involved dealings with Ira Haupt & Co., hereinafter called Haupt, a broker and dealer in securities, in New York City and a member of the New York Stock Exchange. The third transaction involved Sartorius & Co., a broker and dealer in securities in New York City and a member of the New York Stock Exchange, and also involved C. F. Childs & Co., a broker and dealer in securities in New York City. Millridge had a continuing United States Treasury bonds account with Sartorius & Co. In the course of carrying out 4 of the purchases on *66 the market of United States Treasury bonds (excepting the third transaction) loans of all or substantially all of the cost of each of the purchases of bonds charged by Haupt were made by the following banks (at one time or another), and Haupt received the funds from a bank and delivered the Treasury bonds to the bank as collateral for the funds loaned. The banks were: (1) First Seneca Bank and Trust Co., Oil City, Pennsylvania, having as its agent and correspondent bank the Chase Manhattan Bank in New York City, (2) Lake View Trust and Savings Bank in Chicago, (3) National Security Bank in Chicago. In the second transaction, Sartorius & Co., in one of the steps, loaned funds to Millridge, under the account of Millridge with Sartorius, and bonds were transferred to Sartorius to secure the loan. In the third transaction Millridge dealt with Sartorius. When each of the 5 transactions was closed by a sale on the market of bonds, the broker or dealer who handled the sale (Haupt or C. F. Childs) received bonds from the bank (or Sartorius in the third transaction) upon making payment of funds to the bank (or Sartorius) in payment of the particular loan for which the bonds were held as collateral. *67 However, as is shown hereinafter, in some instances Millridge substituted "other bonds" than those purportedly "purchased" by petitioner which, in turn, happened to have been deposited with the particular bank whose loan of funds was to be repaid and discharged with the proceeds of a sale of Treasury bonds on the market; and the "other bonds" apparently were held by the bank to secure other loans arranged by Millridge, which were unrelated to a purported transaction of the petitioner. Millridge or Blair & Co. arranged for the loans of funds by banks, and Sartorius, that were used in the 5 purported transactions of petitioner, and prepared the necessary documents in all 5 transactions; petitioner did not have any contact with the banks, or Sartorius. Neither Millridge nor petitioner ever acquired the actual possession of the Treasury bonds involved in each of the 5 transactions. The money furnished as a loan by each bank in each purchase of bonds on the market was channeled to the dealer who effected the purchase on the market; and when the deal was closed by a sale on the market by the dealer, the proceeds of the sale were channeled from the dealer to the bank holding bonds as collateral. *68 Millridge did not have the funds to make actual loans to petitioner, in each purported transaction with petitioner, and it did not have the financial resources to hold in its inventory (for sale to petitioner) Treasury bonds in the large principal amounts involved in each of the five transactions. For example, during the last 2 months of 1955, Millridge's cash receipts exceeded its disbursements by only $34,885.62, as set forth above. Robert W. Miller, acting for Millridge, and Harry Janin (the accountant) worked out the essential details and steps in each of the 5 transactions, including the purchase price on the market to be paid for the bonds, the type of bonds, the holding periods, the amount of a bank loan, the duration of a loan, the "interest" rate and the amount of the "prepaid interest" to be paid by petitioner; and Miller discussed these details in advance of a transaction with petitioner and Federman, his broker at Haupt & Co. Petitioner also discussed the transactions with Janin, whom petitioner regarded as an outstanding "tax authority". All of petitioner's transactions with Millridge involved prepayment of interest on loans allegedly made to finance the purchase of *69 Treasury bonds; and in each of the 5 transactions in issue petitioner had the right to "prepay" the "loans" made to finance the purchase of the bonds within 6 months. However, in each transaction, petitioner was required to guarantee that he would pay the "interest" for at least 6 months, after which period of time he could cause the bonds to be sold and, in that event, he would receive a refund of the prepaid and prorated "interest." Petitioner never made a credit check on Millridge to determine its financial and capital position. Petitioner never required Millridge to identify by serial numbers the bonds it purportedly purchased for him. There is no evidence that petitioner ever received monthly statements from Millridge, or that Millridge kept a loan account card in his name. In the first, second, fourth, and fifth transactions, the entire amount required to purchase the bonds involved was obtained by borrowing funds, and in each of those transactions petitioner allegedly was the "borrower." The general procedure followed in the 5 transactions in issue was substantially the same, with slight variations. The following matters are descriptive of the steps taken in each transaction. *70 Nos. 1 and 2 Transactions, 2 7/8 Percent Bonds Due March 15, 1957 The first and second transactions involved 2 7/8 percent Treasury bonds issued by the Treasury on September 15, 1953, which were to mature and become due on March 15, 1957. Millridge allegedly sold petitioner $500,000 of these bonds on November 14, 1955, in the first transaction, and $250,000 of the same series of bonds 8 days later, on November 22, 1955, in the second transaction. Millridge closed out both of petitioner's transactions on September 25, 1956, when Millridge allegedly purchased $750,000 of the bonds from petitioner. Millridge instructed Ira Haupt & Co. (hereinafter called Haupt) to sell on the market, with a settlement date of September 26, 1956, $1,250,000 principal amount of the 2 7/8 percent bonds, which included the $500,000 bonds involved in petitioner's first transaction, and the $250,000 bonds, in the second transaction. David J. Brown, deceased, was a resident of Chicago in 1955 and was petitioner's brother-in-law. Petitioner arranged a transaction with Millridge to purchase for Brown's account $500,000 of the 2 7/8 percent bonds at the same time as petitioner's first transaction *71 involving $500,000 of the bonds was arranged. As is shown hereafter, some of the formal steps taken by Millridge involving petitioner's first transaction included and related to the $500,000 bonds involved in the Brown transaction (or a total of $1,000,000 bonds). The transaction for Brown was also closed by Millridge on Setember 25, 1956, when Millridge made credits on its books to the account of the Estate of David J. Brown for a "purchase" by Millridge of $500,000 bonds from the estate. The New York prime bank rate of interest was as follows on each of the dates listed: Date
Interest Rate
3/18/54
3%
8/ 3/54
3 1/4%
10/14/55
3 1/2%
4/13/56
3 3/4%
8/20/56
4%
8/ 6/57
4 1/2%
1/22/58
4% The above shows the date on which the New York prime bank rate of interest was changed and the resulting rate. The high and low prices at which the 2 7/8 bonds (due March 15, 1957) were traded from November 1, 1955, to September 30, 1956, were 100 23/32 and 99 27/32. The bid and asked prices set forth above for Treasury bonds are subject to variations ranging up to 2/32nds, depending upon the sources from which a quotation is obtained. The bid and asked market prices *72 of 2 7/8 percent Treasury bonds due March 15, 1957, on November 14 and 22, 1955, and September 25, 1956, were as follows: Date
Bid
Asked
11/14/55
100-16/32
100-18/32
11/22/55
100- 8/32
100-10/32
9/25/56
99-27/32
99-29/32
The First Transaction: Millridge sent to petitioner its invoice, dated November 14, 1955, for a sale to him of $500,000 Treasury bonds, due March 15, 1957, 2 7/8 percent. It was stated on the invoice that the interest coupons due March 15 and September 15, 1956, were "detached." The invoice price of Millridge to petitioner for the bonds was 97 24/32, which was below the bid and asked market prices for these bonds on November 14, 1955, but the bonds were invoiced by Millridge to petitioner as though the 2 interest coupons for 1 year's interest were "detached." Millridge accordingly billed petitioner $489,130. The charge of Millridge on its invoice to petitioner for $500,000 bonds in the net amount of $489,130 was computed by Millridge as follows: (1) Contemporaneously, settlement date November 15, 1955, Haupt sold Millridge $500,000, 2 7/8 bonds due March 15, 1957, at the market price of 100 20/32, with all of the coupons attached, *73 for $503,125, plus accrued bond interest of $2,408.99, or a total price of $505,533.99. [2] Haupt sent Millridge a sale invoice which included the above purchase of $500,000 of bonds. Millridge did not take delivery of the bonds from Haupt, however, as is set forth later. (2) The charge of Millridge to petitioner on the invoice of Millridge was computed as follows: Cost of $500,000 bonds purchased
from Haupt exclusive of accrued
bond interest
$503,125.00
Less: Detached bond coupons, 1
year
14,375.00
$488,750.00
Add: Discount on coupons
380.00
$489,130.00
Petitioner did not pay Millridge any cash in any amount in payment of Millridge's invoice, and he did not receive possession of the $500,000 bonds. His arrangements with Millridge involved giving *74 Millridge his promissory note, with recourse, in the principal amount of $489,130, due on January 25, 1957 (less than 2 months prior to the date of the maturity of the bonds on March 15, 1957), bearing interest. Petitioner prepaid the interest on his promissory note to Millridge. The details about the promissory note and prepayment of interest on the note are set forth hereinafter. In order to pay Haupt for its purchase on November 15th of $1,000,000 bonds (including the $500,000 in petitioner's first transaction, the other $500,000 bonds being for the Brown transaction), Millridge borrowed $986,250 from First Seneca Bank and Trust Company in Oil City, Pennsylvania, under the promissory note of Millridge, signed by Ortmann as president, dated November 16, 1955, Millridge gave Haupt its check, payable to Haupt, dated November 15, 1955, in the amount of $24,914.79, representing $24,817.59, plus one day's interest of $97.20. (The difference between $1,011,067.99, charged by Haupt, and $986,250 borrowed from Seneca, is $24,817.99, rather than $24,817.59; the discrepancy of 40 cents is not explained.) Millridge, by Ortmann, sent a letter dated November 15, 1955, to Ira Haupt & Co., as *75 follows: We enclose herewith, instructions for you to deliver to the First Seneca Bank & Trust Co., at the Chase Manhattan Bank, $1,000,000 U.S. Treas. bonds, as indicated. Also enclosed is check of $24,914.79 payable to you representing difference of $24,817.59 and one day's interest of $97.20. Chase Manhattan Bank in New York City is a correspondent bank of First Seneca Bank and Trust Company. Haupt delivered the $1,000,000 bonds to Chase and received $986,250 on November 16, 1955. Millridge, on the same date, delivered to Chase its promissory note payable to Seneca in the amount of $986,250. The $1,000,000 bonds were deposited with Chase as collateral security for the note, to be held for the account of Seneca. Millridge also delivered its check to Chase, for the account of Seneca, in the amount of $15,944.37, prepayment of interest on Seneca's loan at 3 percent for 6 months and 10 days, to May 26, 1956, the due date of the note of Millridge, and a copy of the resolution of the board of directors of Millridge adopted on November 14, 1955, authorizing Ortmann to borrow any amount of money from and to pledge with Seneca $1,000,000 Treasury bonds, 2 7/8, due March 15, 1957, as *76 security for the loan. The promissory note of Millridge to Seneca was dated November 16, 1955, and was for 6 months and 10 days, due date May 26, 1956; it was in the amount of $986,250; and recites that the $1,000,000 Treasury bonds had been deposited with Seneca as collateral security. In addition, it is stated that the collateral security included the interest coupons of the bonds due March 15 and September 15, 1956, "detached". There is no evidence that the 2 interest coupons were physically detached from each bond as of November 16, 1955. On that date, there would not be any ordinary and customary reason for clipping in advance from each bond, the interest coupons to become due on March 15, and September 15, 1956. The promissory note of Sidney B. Lifschultz (petitioner) to Millridge is dated November 16, 1955. The note was prepared for petitioner's signature by Millridge on a form of that company. There was an error in the first note prepared by Millridge, which prepared a corrected note for petitioner's signature. As of January 16, 1956, petitioner had not signed the corrected note; he signed it at some time after January 16, 1956. As heretofore stated, petitioner executed *77 a promissory note for $489,130, with recourse, payable to Millridge, dated November 16, 1955, and due January 25, 1957. The rate of the interest to be paid by petitioner on the note is not stated on the note. The clause, "with interest at…. % per annum" which was originally part of the form of the note was blocked out. The following is the last paragraph of the text of the note: Interest in the amount of $23,301.37 has been prepaid. The obligee shall have the right to charge further interest on this obligation upon the giving of five days notice to the undersigned at any time on and after 5/15/56, but upon the receipt of such notice and in any event on and after 5/15/56 the undersigned shall have the right to prepay this obligation and receive back any unearned interest at 3 1/2% per annum pro rated for the unexpired term. The petitioner paid Millridge $23,301.37 by his check dated November 10, 1955. The only record on the books of Millridge for cash received from petitioner in connection with the first transaction is the receipt on November 14, 1955, of the above amount. The amount of $23,301.37, is more than 3 1/2 percent of $489,130 for the period November 16, 1955, to January 25, 1956, a *78 period of 1 year, 2 months, and 9 days. This sum is said on the face of petitioner's note to represent prepaid "interest". The record does not clearly explain the basis of the computation by Millridge of the sum of $23,301.37. In a letter from Harry Janin to Robert Miller (for Millridge) dated November 16, 1955, Janin wrote that "it is necessary to compute the interest on their indebtedness [Lifschultz and Brown] to Millridge from September 15, 1955 rather than November 15, 1955. If this is not done they will receive the benefit of two months interest". Petitioner's note to Millridge is incorporated herein by reference. In material part, in addition to the above, the terms of the note included the following: That Lifschultz had deposited with Millridge or its assigns as security $500,000, 2 7/8 Treasury bonds due March 15, 1957, with the interest coupons due in March and September, 1956 "detached"; that Millridge had the right to pledge the collateral pledged with it; that the pledged collateral could be applied to the payment of the note and could be sold for that purpose; and that if the note was not in or did not go into default, payments of interest * * * received by the obligee *79 on the property pledged as collateral shall be paid to the maker of the note. As already set forth above, the last paragraph provided that Lifschultz had the right "to prepay" the note after May 15, 1956, i.e. the first 6 months from the date of the note, and to receive back any "prepaid" but "unearned" interest on the note at the rate of 3 1/2 percent per year prorated for the unexpired term of the note. The letter of November 16, 1955, from Janin to Miller (for Millridge), set forth below, refers to $1,000,000, 2 7/8 bonds due in 1957, meaning $500,000 in the transaction with Brown, and $500,000 in the transaction with Lifschultz. In this letter, it is said that each of them was "being credited with the full year's coupons [of the bonds]", and that the interest payment on the note of each one to Millridge was to be computed at 3 1/2 percent of the amount of each note ($489,130, each) from September 15, 1955, to January 25, 1957; and that each had the right to pay his note after 6 months and receive a refund of interest at 3 1/2 percent. The letter is as follows: Dear Bob: As I explained to you on the telephone, Millridge's charges to Brown and Lifschultz should aggregate *80 $978,260 for $1,000,000 of United States Treasury's 2 7/8 of 1957 with March 15, 1956 and September 15, 1956 interest coupons detached. This amount was determined as follows: Cost of bonds purchased
(exclusive of accrued interest)
$1,006,250
Less coupons for one year
28,750
$977,500
Add discount on coupons
760
$978,260
Discount was computed at the rate of 3 1/2% per annum and for a period of six months with respect to the first coupon and for one year with respect to the second. In view of the fact that interest has accrued on the bonds for approximately two months and Brown and Lifschultz are being credited with the full year's coupons, it is necessary to compute the interest on their indebtedness to Millridge from September 15, 1955 rather than November 15, 1955. If this is not done, they will receive the benefit of two months interest. The aggregate interest payment of $46,602.44 represents interest at the rate of 3 1/2% per annum on $978,260 from September 15, 1955 to January 25, 1957. It is for this reason I have suggested that the note be made payable on January 25, 1957. He failed to take this two month deferential into account in his letter *81 of November 14th but I have since discussed it with him and he recognizes the need for the adjustment. The note gives Brown and Lifschultz a firm interest rate for six months. The rate thereafter may be increased upon five days notice. If it is increased, they have the right to repay the note and receive a rebate of interest at the rate of 3 1/2% per annum from the date of prepayment to January 25, 1957. In any event, they have the right to pay the note after six months and receive the same rebate. On March 9, 1956, Ortmann instructed Seneca to present for collection the bond interest coupons payable March 15, 1956, and to apply the proceeds in reduction of the loan of Seneca to Millridge and of the note of Millridge, those coupons being related to the $1,000,000, 2 7/8 bonds pledged to secure Millridge's note. Seneca's loan to Millridge became due on May 26, 1956. Robert Miller (with Millridge) obtained a new loan from Lake View Trust & Savings Bank, in Chicago, in the amount of $728,841.56, and he instructed Lake View to pay that amount to Seneca and to obtain from Seneca $750,000 (out of $1,000,000) of the 2 7/8 Treasury bonds held as collateral security for Seneca's loan *82 to Millridge with the "detached" interest coupons due September 15, 1956. A promissory note dated May 28, 1956, due September 17, 1956, in the amount of $728,841.56, payable to Lake View, was given to Lake View to secure the above loan. This note was signed by Robert W. Miller, as an individual. The note bore interest at the rate of 4 1/4 percent for the period from the date thereof to September 17, 1956, and at the rate of 7 percent after the maturity date. The note recites that the collateral security for payment thereof is $750,000, 2 7/8 Treasury bonds due in 1957, with the interest coupon payable September 15, 1956, "detached". On May 24, 1956, Millridge exercised its right under the note of Lifschultz dated November 16, 1955, to increase the rate of interest payable on the note. Millridge increased the rate of interest to 4 1/2 percent. The loan of Seneca to Millridge on November 16, 1955, in the amount of $986,250, was paid upon maturity on May 26, 1956, in the following way: Part of the loan (and note), $728,841.56, was paid with the funds borrowed from Lake View (as set forth above); and the balance was paid by Millridge with other funds which it borrowed from Sartorius *83 & Co. on May 29, 1956, i.e. $242,947.19, plus $78.13. Bonds in the face amount of $250,000 were transferred on that date to Millridge's Treasury bond account with Sartorius. The first transaction of petitioner with Millridge, involving $500,000, 2 7/8 Treasury bonds due March 15, 1957, was closed on September 25, 1956, at the same time that petitioner's second transaction with Millridge was closed, which involved $250,000 of the same series of Treasury bonds. The facts relating to the closing of the first and second transactions are set forth hereinafter. The Second Transaction: On November 22, 1955, petitioner entered into the second transaction with Millridge involving his purported purchase of $250,000 face amount of 2 7/8 percent Treasury bonds due March 15, 1957. As in the first transaction, as between petitioner and Millridge, the interest coupons of the bonds for 1 year, payable March 15 and September 15, 1956, were "detached". In general, the same steps were followed as in the first transaction and the same issue of Treasury bonds was involved, i.e., petitioner gave a promissory note to Millridge and he prepaid the "interest" provided for by the terms of the note, the details *84 being set forth hereinafter. On November 22, 1955, Millridge bought from Ira Haupt & Co. $250,000 of the bonds described above at the price of 100 - 6/32 plus 1/64 (the plus 1/64 being unexplained here). The price of the bonds, principal amount, was $250,507.81, plus accrued interest $1,342.72, a total cost of $251,850.53. Of course, all interest coupons were attached to the bonds. Millridge, on November 22, 1955, instructed Haupt to deliver the bonds to Chase Manhattan Bank for the account of First Seneca Bank & Trust Co.; to receive payment by Chase of $245,500; and Millridge gave its check for the balance due Haupt, $6,350.53. The $250,000 bonds were pledged with Seneca as collateral security for the promissory note of Millridge payable to Seneca in the amount of $245,500, dated November 25, 1955, and due in 6 months and 10 days, on June 5, 1956, bearing 3 per cent interest. Millridge, by letter dated November 22, 1955, addressed to Chase Manhattan Bank for the account of Seneca, delivered its note payable to Seneca and the check of Millridge for $3,887.08, advance payment of 3 percent interest on its note for the full term of the note, together with corporate authority to *85 borrow the funds and instructions to receive the bonds from Haupt against the payment of the funds to Haupt. On the promissory note, payable to Seneca, the collateral security was stated to be the $250,000, 2 7/8 percent bonds due March 15, 1957, together with the interest coupons on the bonds payable on March 15 and September 15, 1956, "detached". As between Millridge and petitioner, this transaction was handled as follows: Millridge sent petitioner its own invoice dated November 22, 1955, reciting that it had sold to petitioner $250,000, 2 7/8 bonds due March 15, 1957, with the interest coupons due in March and September, 1956, "detached" at the price of 97-21/64, $243,320.31. The bonds were not delivered to petitioner and he did not hold them at any time. On November 25, 1955, petitioner delivered to Millridge his promissory note, with recourse, dated November 22, 1955, due March 15, 1957, for $243,320.31, bearing 3 1/2 percent interest, secured by the $250,000 bonds, with the 1956 interest coupons "detached", together with his check payable to Millridge dated November 22, 1955, for $12,939.88, representing prepayment of "interest" for the term of the note. As in the first note, *86 this note provided that Millridge could charge a higher rate of interest after 6 months, May 22, 1956, and that petitioner could pay the note after 6 months, the above date, and receive a refund of unearned "interest" prorated over the unexpired term of the note. In both of petitioner's notes, dated November 16, 1955; and November 22, 1955, Millridge was given the right to hypothecate the property "pledged with it" as collateral security for each note. The second note was prepared for petitioner's signature by Millridge and was in the identical form as the first note, except that the rate of interest on the second note is clearly 3 1/2 percent per annum. On March 9, 1956, Millridge instructed Seneca to present for collection the bond interest coupons due March 15, 1956, related to the $250,000 bonds and to apply the proceeds in reduction of Millridge's note for $245,500. Millridge paid its note to Seneca, which became due on June 5, 1956, by borrowing from Sartorius & Company, New York City, on its margin account there, and instructed Sartorius to receive from Chase Manhattan from the account of Seneca the $250,000 bonds upon payment of funds to Seneca in the amount owing under *87 Millridge's note. On May 29, 1956, Sartorius sent Millridge written confirmation that it had received for the account of Millridge from Chase Manhattan, account of Seneca, $250,000, 2 7/8 bonds, and had paid Chase $242,947.19 (evidently the balance owing on the loan to Millridge of $245,500). On May 24, 1956, Millridge advised petitioner by letter that it had exercised its right to increase the rate of interest on his note to 4 1/2 percent. With respect to the 1956 coupons for bond interest on bonds pledged by Millridge with the various banks and others to secure the respective loans to Millridge (the so-called "detached" coupons), the following letters of instructions were sent: (1) On September 14, 1956, Millridge instructed Seneca to make collection on the coupons maturing September 15, 1956, and to apply the proceeds to reduce its note secured (originally) by $1,000,000, collateral, 2 7/8 percent bonds due March 15, 1957. (2) On September 14, 1956, Millridge instructed Lake View to make collection on the coupons maturing September 15, 1956, and apply the proceeds to reduce its note secured by 2 7/8 percent bonds in the amount of $1,000,000 due March 15, 1957. This letter refers *88 to $1,000,000 bonds of 1957 held by Lake View to secure its loan of $986,500 to Millridge. (3) On September 14, 1956, Millridge instructed Seneca to make collection on the bond coupons for interest maturing September 15, 1956, and to apply the proceeds to reduce the loan to Millridge secured by $250,000, 2 7/8 bonds due March 15, 1957. (4) On September 18, 1956, Millridge instructed Sartorius to make collection of the bond interest coupons maturing September 15, 1956, related to the $250,000, 2 7/8 bonds of 1957 held by them as collateral on the loan of $245,000 to Millridge (of which Sartorius had paid Seneca $242,947.19, supra). Closing of Transactions 1 and 2: As between Millridge and petitioner, transactions 1 and 2 relating to $750,000 face amount of bonds due in 1957 were closed in September, 1956, and at the same time the transaction of November 14, 1955, between Millridge and Brown was closed relating to $500,000 of the same issue of bonds, so that the steps taken by Millridge related to bonds in the total amount of $1,250,000. The following steps were taken by Millridge: (1) Pursuant to various instructions of Millridge dated September 25, 1956, Ira Haupt & Co. bought from *89 Millridge (settlement date September 26) $1,250,000, 2 7/8 bonds due March 15, 1957, at the market price of 99-28/32, $1,248,437.50; the accrued interest amounted to $1,092.03; the total amount of the purchase price was $1,249,529.53. This sale by Millridge to Haupt included the bonds in the first ($500,000) and second ($250,000) transactions with petitioner, and the transaction with Brown ($500,000). (2) On September 25, 1956, Millridge gave written instructions to Lake View and to Haupt, respectively, whereby Lake View delivered $750,000 bonds to Haupt, for which Haupt paid Lake View, for the account of Millridge, the amount owing under the notes of Millridge, plus accrued interest, $718,829.66. The payment by Haupt satisfied the then outstanding loan of Lake View to Millridge. (3) The additional $500,000 bonds were on deposit with State Bank & Trust Co. in Evanston, Illinois, and they were delivered to Haupt against Haupt's payment for the account of Millridge at State Bank. At the end of September, 1956, Millridge still owed Sartorius on its loans which were secured by $500,000 face amount of the 2 7/8 percent bonds. Millridge had borrowed from Sartorius on May 29, 1956, $242,947.19, *90 plus $78.13, secured by $250,000 bonds which were transferred by Seneca to Sartorius and Millridge had borrowed $241,882.89, plus $78.13 from Sartorius on June 5, 1955, and another $250,000 bonds (second transaction) had been transferred by Seneca to Sartorius on June 11, 1955, to Millridge's Treasury bond account with Sartorius to secure the loan of Sartorius. (Additional facts are set forth hereinafter relating to loans to Millridge, and to the application of the collections of matured coupons for bond interest.) Millridge sent petitioner an invoice dated September 25, 1956, to confirm the purchase from him of $750,000, 2 7/8 bonds at the price of 99-28/32, $749,062.50, plus accrued interest of $665.22, or the total sum of $749,717.72. The price of 99-28/32 was the same as the price at which Haupt bought the bonds according to its invoice to Millridge. Millridge refunded to petitioner out of his payments under the 2 notes relating to the first and second transactions the total sum of $7,245.77, of which Millridge refunded $6,840.82 on September 27, 1956, and $404.95 on January 23, 1957. The latter payment was made due to Millridge's error in its computations in September, 1957 *91 of "interest" owing by petitioner on his 2 notes up to the time of the termination of both transactions with Millridge on September 25, 1956. The correct computation by Millridge of "interest" on the 2 notes is as follows: Paid to Millridge as "prepaid inter-
est": 1. Note for $489,130.00
$23,301.37
2. Note for 243,320.31
12,939.88
Total $732,450.31
$36,241.25
Charges by Millridge as "interest",
notes,
256 days at 3 1/2%
$732,450.31
$17,978.88
122 days at 4 1/2%
11,016.60
Total charges
$28,995.48
Paid by petitioner in advance
$36,241.25
Charged by Millridge
$28,995.48
Total refund to petitioner
$ 7,245.77
On September 27, 1956, Millridge sent a letter to petitioner accounting for the first and second transactions in $750,000 bonds in which an amount was computed as capital gain (and the computations of the "interest" charges and refunds were also made) as follows: Millridge "bought" from petitioner
for
$749,062.50
Millridge "sold" to petitioner for
732,450.31
Balance, petitioner's favor, capital
gain
$ 16,612.19
Accrued bond interest after 9/15/56
655.22
Due petitioner by Millridge
$ 17,267.41
Millridge *92 paid petitioner $17,267.41 by check, on September 27, 1956, representing the balance in his favor under the 2 transactions, and also returned his 2 notes marked "Paid". The computation of a capital gain on each transaction (above) is based upon what Millridge charged petitioner in each instance, namely, 97-24/32 on November 15, 1955, for $500,000 bonds, and 97-21/64 on November 22, 1955, each price being below the market price on each date because the price charged by Millridge was based upon "detaching" 2 bond coupons, or bond interest for 1 year. On November 15, 1955, the market price for the bonds was above par, 100-20/32 (the charge of Haupt to Millridge); and on November 22, 1955, the market price was above par, 100-6/32. It was considered to be not good market and delivery practice, in the general market for Treasury bonds, to trade the bonds with some of the bond interest coupons detached. To trade in Treasury bonds on the basis of detaching some of the interest coupons that would mature at a subsequent date was outside the normal practice of the major dealers in government securities. The following schedule shows the differences between the prices for the bonds used by *93 Millridge in its 2 transactions with petitioner and the market prices for the same bonds: "Purchases" from Millridge
Market Prices
No.
Date
Millridge Price
Bid
Ask
1
11/15/55
97-24/32
100-16/32
100-18/32
2
11/22/55
97-21/64
100- 8/32
100-10/32
"Sales" to Millridge
1
9/25/56
99-28/32
99-27/32
99-29/32
2
9/25/56
99-28/32
99-27/32
99-29/32
In the second transaction, the price of $250,000 bonds at 100-6/32, exclusive of accrued bond interest, was $250,507.81, as shown in the invoice of Ira Haupt & Co. to Millridge dated November 22, 1955. The price for those bonds fixed by Millridge in its transaction with petitioner on the same date, $243,320.31, represented the above market price less 2 bond interest coupons for 1 years, $7,187.50, as follows: Cost of bonds per Haupt
$250,507.81
Less coupons for 1 year
7,187.50
Millridge price to petitioner
$243,320.31
The sum of $243,320.31 (the above Millridge price) represents a price of 97-21/64 at which the bonds would be sold with 1 year's coupon detached. In the first transaction the only record of cash received from petitioner, on Millridge's books, *94 is the receipt of $23,301.37 on November 14, 1955, the so-called prepaid "interest". (There is an entry of a similar amount of cash received from David J. Brown). When Millridge's loan from Seneca (involving petitioner and Brown) on the first transaction matured on May 26, 1956, Millridge paid part of the loan by borrowing $728,841.56 from Lake View. Bonds in the face amount of $750,000, securing the Seneca loan, were transferred to Lake View to secure the Lake View loan. Millridge paid the balance of its matured loan (involving petitioner and Brown) with Seneca by borrowing $242,947.19 and $78.13 from Sartorius on May 29, 1956. Bonds in the face amount of $250,000 were transferred to Millridge's Treasury Bond Account with Sartorius on that date. Millridge still had a second loan outstanding with Seneca (second transaction), which was secured by $250,000 face amount of the bonds. Thus, at the end of May, 1956, the status of the loans described above was as follows: (a) Millridge had a loan outstanding from Lake View secured by $750,000 of bonds. (b) Millridge owed money to Sartorius secured by $250,000 face amount of bonds. (c) Millridge still had outstanding its initial loan *95 from the second transaction from Seneca secured by $250,000 of bonds. When the second loan (i.e. second transaction) made by Seneca to Millridge matured on June 5, 1956, it was paid by Millridge by borrowing $241,882.89 and $78.13 from Sartorius. Bonds in the face amount of $250,000 were transferred from Seneca to Millridge's Treasury Bond Account with Sartorius on June 11, 1956. As of the end of June, 1956, the status of the loans was as follows: (a) Millridge had a loan outstanding from Lake View secured by $750,000 of bonds. (b) Millridge owed money to Sartorius secured by $500,000 of bonds. On September 26, 1956, Millridge directed Haupt to sell $1,250,000 of the 2 7/8 bonds, and directed Lake View to deliver $750,000 bonds to Haupt, and directed State Bank to deliver $500,000 bonds to Haupt; and Millridge used the proceeds of Haupt's sale of the bonds on the market to pay its indebtedness to both Lake View and State Bank. At the end of September, 1956, Millridge still had a loan indebtedness owing to Sartorius secured by $500,000 of the 2 7/8 bonds. The Bond Purchase and Sales Journal of Millridge on its books of account shows that on March 15, 1956, Millridge credited *96 interest coupons, from the following amounts of 2 7/8 percent Treasury bonds due March 15, 1957, from the banks and brokers listed below: Sartorius
$ 800,000
Lake View
500,000
State Bank & Trust Co.
500,000
First Seneca
1,250,000
National Security
500,000
$3,550,000
The Bond Purchase and Sales Journal of Millridge, its books of account, show that on September 15, 1956, Millridge credited interest coupons from the following amounts of 2 7/8 percent Treasury bonds due March 15, 1957, from the banks and brokers listed below: Sartorius
$1,300,000
Lake View
1,250,000
State Bank & Trust Co.
500,000
National Security
500,000
$3,550,000
The Bond Purchase and Sales Journal of Millridge, its books of account, show that on September 25, 1956, petitioner was credited in the amount of $749,717.72, including accrued interest, upon the "purchase" by Millridge of $750,000 face amount of bonds; and further shows that on the same date the Estate of David J. Brown was credited in the amount of $499,811.80, including accrued interest, upon the "purchase" of $500,000 of bonds by Millridge. The books further show that on October 2, 1956, Millridge *97 credited its account in the amount of $1,249,529.52 (the aggregate of the amounts credited to petitioner and the Estate of David J. Brown) upon the sale by Haupt of $1,250,000 face amount of bonds. After the completion of the foregoing "purchases" and "sales", Millridge had bonds deposited with Sartorius and the National Security Bank, and had $500,000 bonds still deposited with Lake View. All of such bonds were presumably used in other Millridge transactions, which did not relate to the petitioner. In his return for 1956, petitioner combined transactions 1 and 2, $750,000 bonds, for the purpose of reporting them. He reported a long-term capital gain of $16,612.19. This amount of "gain" represented the "cost" to him charged by Millridge and the "sales price" credited to him by Millridge, in both transactions, as follows: 9/25/56 "Purchase" by Millridge
from petitioner
$749,062.50
Nov., 1955 "Sold" by Millridge to
petitioner
732,450.31
Gain reported by petitioner
$ 16,612.19
Petitioner did not take into account in computing the purported gain on both transactions the net amount that he had paid Millridge as "interest", $28,340.26, which exceeded his purported *98 gain by $11,728.07, which represented a loss on both transactions. The net amount paid to Millridge as interest was: No. 1 Prepaid "interest"
$23,301.37
No. 2 Prepaid "interest"
12,939.88
Total
$36,241.25
Refunded "interest":
$6,840.82
404.95
7,245.77
Accrued bond interest
$ 655.22
$7,900.99
$ 7,900.99
$28,340.26
Petitioner's loss was as follows: Net payments to Millridge
$28,340.26
Purported long-term gain
16,612.19
Loss
$11,728.07
No. 3 Transaction, 2 7/8 Percent Bonds Due June 15, 1958 The third transaction of petitioner and Millridge was initiated on April 11, 1956; it related to $500,000 face amount of Treasury bonds issued December 1, 1955, and maturing on June 15, 1958, bearing 2 7/8 percent interest. As between petitioner and Millridge,Millridge charged petitioner a price less one year's bond interest, 2 coupons "detached". The following steps were taken: On April 11, 1956, Millridge directed Sartorius to purchase for its account, closing date April 16, 1956, $500,000 of the above-described bonds; and Sartorius bought them at 99 33/64, for $497,578.13. There was accrued interest of $5,380.81 making the *99 cost $502,958.94, plus a commission of $156.25, or a total cost of $503,115.19. Millridge made this purchase through Sartorius on margin under its Treasury bond account. Millridge's account with Sartorius was debited $503,115.19 on April 16, 1956, and on the same date 2 credits were entered in the account for $15,200 and $10,000. This bond account shows that Sartorius charged Millridge 3 1/4 percent interest on the unpaid balance of the account. Sartorius purchased these bonds from "First Boston." Sartorious held the bonds at all times. Millridge closed this transaction with Sartorius through an order to sell on January 4, 1957, closing date January 7, 1957. Sartorius sold the $500,000, bonds to C. F. Childs Company in New York City at the price of 98 31/32, $494,843.75, plus accrued interest of $908.31, or a total price of $495,752.06, less a commission of $156.25, making the net amount of the sale $495,595.81, which amount was credited to the Treasury bond account of Millridge on January 7, 1957, on the books of Sartorius. The market prices of 2 7/8 percent Treasury bonds due June 15, 1958, on April 11, 1956, and January 4, 1957, were as follows: Bid
Asked
April 11, 1956
99-15/32
99-17/32
January 4, 1957
98-29/32
98-31/32
*100 The high and low prices of the same issue of bonds traded during the period from April 1, 1956 to January 31, 1957, were 100 3/32, high, to 98 16/32, low. Millridge's transaction in these bonds with Sartorius reflected a loss, as follows: Bought April 16, 1956 at 99-33/64
$503,115.19
Sold January 7, 1957 at 98-31/32
495,595.81
Loss
$ 7,519.38
After April 20, 1956, until December, 1956, Sartorius charged Millridge 3 1/2 percent interest on its debit balance. After the end of 1956, Sartorius charged Millridge 4 percent interest. The New York prime bank interest rate was 3 3/4 percent on and after April 13, 1956, and was increased to 4 percent on and after August 20, 1956. As between Millridge and petitioner, the following steps were taken: Millridge charged petitioner on April 11, 1956, a price of 96 43/64 or $488,740.19, with the bond coupons maturing on June 15, and December 15, 1956, "detached". On January 7, 1957, Millridge credited petitioner, under its invoice, as a "purchase" from him at the price of 98 31/32 (exclusive of bond interest for 1 year), $494,687.50, plus accrued bond interest of $908.31, or a total sum of $495,595.81. In this transaction, *101 after Millridge had prepared 2 promissory notes for petitioner's signature which set forth the incorrect amounts of "indebtedness," a third promissory note was prepared by Millridge, dated April 11, 1956, for petitioner which he executed in October. This note is in the same form as those used in the two earlier transactions. The note, dated April 11, 1956, was in the corrected amount of $475,740.19; it was to become due December 15, 1956; petitioner had the right "to prepay" the note at any time after October 9, 1956, after 6 months. The note does not recite the original rate of interest but states that interest in the amount of $12,926.07 had been prepaid, and that Millridge could charge additional interest after October 9, 1956. The prepaid "interest" was $12,925.97. The note is a full recourse note. It recites that the maker had "deposited" with Millridge $500,000 bonds due June 15, 1958, with the coupons maturing June 15 and December 15, 1956, "detached", and that Millridge could hypothecate the bonds. Petitioner did not receive the bonds; they were held by Sartorius. The price to petitioner on the invoice of Millridge for the "purchase" of the bonds for his account (96 43/64) *102 represented the price at which Millridge bought the bonds through Sartorius (99 33/64) less the amount of the 2 interest coupons maturing in June and December, 1956, in the amount of $14,375. The invoice charge of Millridge to petitioner on April 11, 1956, of $488,740.19 was computed by Millridge as follows: Cost. Sartorius, 99-33/64
$497,578.13
Accrued bond interest
5,380.81
$502,958.94
Sartorius commission
156.25
$503,115.19
Less June, Dec. coupons
14,375.00
Millridge invoice amount
$488,740.19
Millridge charged petitioner $13,000 as "margin", which petitioner paid on April 17, 1956. The amount of petitioner's note, $475,740.19, was the balance of Millridge's invoice charged to him after the above payment. Millridge advised petitioner of the above details in a letter to him on April 17, 1956, in which there were some errors in figures that were corrected later by Millridge and were the reason for its preparation of a corrected promissory note for petitioner's signature on October 8, 1956. Millridge requested petitioner's payment of $12,750.20 as prepayment of "interest" on his promissory note, which petitioner paid on April 17, 1956, the amount *103 being computed by Millridge as follows: 4%, 349 days (4/11-12/15) on note
$12,710.74
4%, 66 days (4/11- 6/15) on $5,380.81
39.46
$12,750.20
On September 28, 1956, Millridge notified petitioner that the correction of the amount of his note to $475,740.19 required his payment of $175.77 additional "interest". On October 5, 1956, petitioner paid Millridge $175.77, making his total payment of advance "interest" $12,925.97. On October 18, 1956, Millridge increased the interest on petitioner's note from 4 to 4 1/2 percent. The price at which Millridge "purchased" the bonds from petitioner on January 7, 1957, was 98 31/32 which was the market price at which Sartorius sold them to C. F. Childs Company. Petitioner's note to Millridge matured on December 15, 1956, but was extended to January 7, 1957, at which time Millridge reviewed its original computation of "interest" charged petitioner. In a letter dated January 8, 1957, Millridge advised petitioner that he owed more "interest" in the amount of $1,763.13, as follows: 4% on $475,740.19 for 185 days
$ 9,645.14
4 1/2% (on same) for 83 days
4,868.19
$14,513.33
Interest "prepaid"
12,750.20
Interest due
$ 1,763.13
*104 The computation of the balance of the "interest" due was incorrect as it did not credit petitioner with the payment of $175.77 on October 5, 1956, which reduced the amount of the "interest" due Millridge to $1,587.36. Evidently there was a subsequent adjustment by Millridge. On January 8, 1957, Millridge advised petitioner by letter of the closing of this transaction, returned his cancelled note, refunded $13,000 to him (the amount of the margin he had deposited), and also paid him an amount as his profit on the transaction. Millridge sent petitioner its check in the amount of $18,092.49, which consisted of the following: Refund of margin
$ 13,000.00
Difference in cost and sale price of
bonds
6,855.62
$19,855.62
Less: Additional interest
1,763.13
$ 18,092.49
The "gain" on the transaction was computed as follows: 1/ 7/57 "Sale" of bonds to Millridge
$495,595.81
4/11/56 "Purchase" of bonds from
Millridge
488,740.19
Difference
$ 6,855.62
In his income tax return for 1957, petitioner reported long-term capital gain from this transaction, but computed the amount incorrectly as $24,328.12. In so doing, he used as his "sales price" $494,687.50 *105 (rather than $495,595.81), excluding the accrued interest of $908.31; and he used $470,359.38 as his "cost" (rather than $488,740.19 which included accrued interest). The figure used as "cost" was an amount remaining after excluding his payment of $13,000 and the amount of the "detached" bond coupons, $14,375. Based upon the market prices at which Sartorius bought the bonds in April, 1956, and sold them in January, 1957, for the account of Millridge (all coupons attached), there was a loss in this transaction in the amount of $7,519.38 as follows: 4/16/57 Bought by Sartorius at
99-33/64, plus commission
$503,115.19
1/ 7/58 Sold by Sartorius at
98-31/32, less commission
495,595.81
Loss
$ 7,519.38
No. 4 Transaction, 1 1/2 Percent Bonds Due on April 1, 1958 In the fourth transaction, D. H. Blair & Co., through Robert Miller, made the arrangements for petitioner by arranging for the advancing of funds by a bank, National Security Bank of Chicago, and all of the terms and Miller then forwarded the necessary papers to petitioner for his signature. The broker was Ira Haupt & Co., in New York City, and the Treasury bonds were the 1 1/2 percent bonds issued on *106 April 1, 1953, due April 1, 1958. Ira Haupt bought on the market $500,000 of these bonds on October 5, 1956, at 97 19/32 for $487,968.75, plus $82.42 accrued interest, or a total of $488,051.17. The "customer" for whom the bonds were purchased was Sidney B. Lifschultz, and his name appears on the invoice of Haupt. On October 4, 1956, Robert Miller wrote to petitioner (on a letterhead of D. H. Blair & Co., Inc.), the following advice about the arrangements: Enclosed you will find a note of the National Security Bank of Chicago, covering your purchase of 500M U.S. Treasury 1 1/2s 4/1/58. This note runs to maturity of these bonds at 5% interest. The National Security Bank is picking these bonds up for full payment, and in addition to signing of this note and delivery instructions, we are requesting that you send us your check in the amount of $24,402.56 which represents advance interest payment for 360 days. The National Security Bank will allow you the privilege of prepaying this loan at any time after six months, but not before. In the event you desire to keep this loan in effect after six months, it will be necessary for you to prepay another six months interest, however, *107 this will not be a commitment for six months and the loan may be liquidated at any time after the initial six month period. As you explained to me on the telephone, we will request the National Security Bank, upon the due dates of the coupons on these bonds, to forward that coupon interest directly to you. If you have any further questions in this matter, will you please call me. The steps taken in this transaction were as follows: After Miller, acting for D. H. Blair, a money broker, had made the arrangements with National Security Bank and Haupt, the letters of instruction for the several steps involved were signed by petitioner. The correspondent bank in New York City of National Security Bank of Chicago is the First National City Bank of New York. On October 4, 1956, a letter from petitioner was sent to Haupt directing it to deliver the bonds to First National City Bank, for the account of National Security Bank, against the bank's payment of $488,051.17, which was done by Haupt. Petitioner executed a promissory note dated October 8, 1956, due April 1, 1958, in the amount of $488,051.17, bearing 5 percent interest, secured by the $500,000 bonds. The terms of the note, on *108 the bank's printed form, gave the bank the right to sell the collateral and apply the proceeds in payment of the note, under the stated conditions, and (or) to demand the pledge of additional collateral. Also, the maker of the note agreed to confess judgment in a court of record, without process, in the event the note was not paid. The terms of this printed note, provided by National Security Bank, do not provide for prepayment of interest, and do not provide that the note may not be paid prior to the expiration of 6 months. The arrangement made by Miller with National Security Bank, as stated in Miller's letter to petitioner dated October 4, 1956, supra, to the effect that the loan could be paid "at any time after six months, but not before" constituted an agreement apart from the terms of the note itself, and there is no provision in the note for the prepayment of 360 days' interest. The note of the bank was in a different form from the form of the note of Millridge that was used in the first 3 transactions. Also, the terms of the note did not give the bank the right to charge additional interest after the first 6 months. Miller's letter of October 4, therefore, represented arrangements *109 with the bank which were not set forth in the note. Petitioner prepaid the 5 percent "interest" on the amount of the note for 360 days (1 year) in the amount of $24,402.56 by his check dated October 5, 1956, payable to National Security Bank, which he sent to that bank. The maturity date of the note, April 1, 1958, was the same as the maturity date of the 1 1/2 percent bonds involved. The bank collected the bond interest coupons which matured on April 1, 1957, and credited the proceeds, $3,750, to the note reducing the amount thereof to $484,301.17, and so advised petitioner on April 4, 1957. This transaction was closed on May 2, 1957, 7 months after it was initiated. Under petitioner's directions of May 1, 1957, the bank delivered the bonds back to Haupt. Haupt bought the bonds on May 2 at 98 18/32, plus 1/64 for $492,890.63, plus $635.25 accrued interest, or $493,525.88. Haupt's invoice refers to Sidney B. Lifschultz as the "customer". Haupt paid the bank the amount owing under the note, $484,301.17. The proceeds from the sale of the bonds by Haupt ($493,525.88) exceeded the amount owing on the note by $9,224.71. The record here does not show what procedure was followed *110 with respect to that excess. On May 8, 1957, National Security Bank refunded to petitioner $10,386.20, "representing rebate of interest", and returned the note marked "paid." Accordingly, the net amount of the bank's charge for "interest" in this transaction was $14,016.36. The New York prime bank rate of interest prevailing during the period of this transaction was 4 percent per year. The bid and asked market prices for the 1 1/2 percent Treasury bonds due April 1, 1958, were as follows: Bid
Asked
October 5, 1956
97 15/32
97 19/32
May 2, 1957
98 18/32
98 24/32
The high and low prices of the same bonds traded on the market between October 1, 1956, and May 31, 1957, were 98 20/32 high, and 97 10/32 low. In his return for 1957, petitioner reported this transaction as resulting in a long-term capital gain of $4,921.88 on the basis of the principal amount of the prices at which Haupt bought and sold the bonds, exclusive of the amounts of the accrued bond interest included in the invoice charges of Haupt as follows: Sales price
$492,890.63
Cost
487,968.75
Gain
$ 4,921.88
No. 5 Transaction, 1 7/8 Percent Bonds Due February 15, 1959 *111 The fifth transaction involved $1,000,000 face amount of 1 7/8 percent Treasury bonds issued May 17, 1954, maturing February 15, 1959. Robert Miller, acting for Millridge, made arrangements with First Seneca Bank and Trust Company, Oil City, Pennsylvania; Haupt was the broker; and Millridge provided petitioner with the papers to be signed and advised him of the steps to be followed. The arrangements were initiated at some time close to December 13, 1956, when Millridge advised petitioner in a letter of the steps to be taken and sent for his signature a printed form of a promissory note of the Seneca Bank in the amount of $967,571.33. The text of the note provides that the bank can ask for additional collateral if the value of the pledged collateral declines; can sell the collateral pledged if the note goes in default; and that the maker agrees to confess judgment against him for the unpaid amount of the note. The printed form of Seneca's note does not contain any provisions for guaranteeing the payment of "interest" for 6 months, or for prepaying "interest". Those conditions were set forth in Millridge's letter to petitioner dated December 13, 1956, as follows: Enclosed you will *112 find a note in the amount of $967,571.33, which is the total amount of your purchase, including accrued interest on one million, U.S. Treasury 1 7/8, 2/15/59. This loan is being made by the First Seneca Bank & Trust Co. to you on the following conditions. In order that there be no misunderstanding, we are making them as a matter of record: 1. This loan is made until maturity of the bonds, namely 2/15/59. You will have the right after six months to sell these bonds and receive a return of the unused portion of interest. In the event that you elect to sell them prior to that time, there is a six month guarantee of interest to the First Seneca Bank & Trust Co.
2. Coupon interest as it comes due, will be collected by the bank, they will notify you that they have received it, and they will use this money in reduction of the loan. 3. You will give to us, with the signed note, a check in the amount of $48,378.57 made to their order covering interest on this loan for 360 days, which is approximately one year's interest. We will ask the bank to compute the exact amount, so that there cannot be any possible misunderstanding. 4. In the event you elect to carry this loan with them beyond *113 a year, there will be a further prepayment of interest to them at a rate which is to be determined by an adjustment to 1% above the New York prime rate. In other words, on December 15th, 1957, if you decide to continue this loan, and the New York prime rate is 4 1/4%, the rate of interest which they will charge you, will be 5 1/4%. If it is 3 3/4%, the rate they will charge you will be 4 3/4%. Would you be good enough to sign the note and delivery instructions from Haupt to the First Seneca Bank & Trust Co. and return to us by messenger so that we may effect delivery of these bonds on Monday, as well as having the note and check in Oil City on Monday. I would also appreciate it if you would sign the copy of this letter for our files. Haupt purchased for petitioner's account as "customer", from C. J. Devine Company, on December 13, 1956, with settlement date December 17, 1956, $1,000,000 1 7/8 percent Treasury bonds due February 15, 1959, at 96 3/32, plus 1/64, or $961,093.75, plus accrued interest of $6,317.93, or $967,411.68. Haupt made a charge for additional accrued bond interest up to December 17, 1956, of $152.85 increased the cost of the bonds to $967,564.53. Haupt's commission *114 was $312.50, making its total charge $967,877.03. On instruction forms prepared by Millridge, petitioner instructed Haupt on December 13 to deliver the bonds, against payment of $967,571.33, to Chase Manhattan Bank for the account of First Seneca Bank. Haupt delivered the bonds to Chase. Petitioner executed a printed form promissory note payable to Seneca. The note was dated December 18, 1956, and was to become due February 15, 1959, which date was the maturity date of the bonds. The note bore 5 percent interest. The $1,000,000 bonds were deposited as collateral for the note. The note could be paid at any time but petitioner was required to guarantee to the bank the payment of "interest" for 6 months, and if the note was paid before the expiration of 6 months he would not receive a refund of any of the prepaid "interest" for the first 6 months. If the note should be paid after 6 months, "interest" prepaid for a period in excess of 6 months (unearned interest) would be refunded to him. (Those provisions do not appear in the printed note, however.) By his check dated December 13, 1956, petitioner paid Seneca $48,378.57 as an advance payment of Petitioner's account with Haupt *115 was debited $152.85 on December 17, the charge for additional accrued bond interest up to that date. Haupt received payment of $967,571.33 from Seneca, through Chase. The debit to petitioner's account and Senecat' payment made the total payment received by Haupt $967,724.18, which represented the following: Accrued bond interest
$ 152.85
Cost of bonds
961,093.75
Accrued bond interest to 12/13/56
6,317.93
Commission
312.50
$967,877.03
The beginning date of the advance of funds by Seneca was December 18, 1956, as is shown by the same date on the promissory note signed by petitioner. Seneca collected the bond interest coupons that matured on February 15, 1957, in the amount of $9,375 and credited that amount to petitioner's loan account. Seneca collected the bond interest coupons that matured on August 15, 1957, $9,375, and credited that amount to petitioner's loan account. These collections of coupons and the credits reduced the amount of petitioner's note to $948,821.33. This transaction was closed on November 25, 1957, (about 11 months after the beginning thereof). Haupt bought the bonds as of that date at 98 13/32, for $984,062.50, plus accrued interest *116 of $5,197.01, or the total amount of $989,259.51; and Haupt paid to Seneca, through Chase, $948,821.33, the balance due on petitioner's note. The record does not show the disposition of the difference in the amount of $40,438.18, but presumably that net amount was credited by Haupt to petitioner's account. Robert Miller, on November 22, 1957, instructed Seneca to deliver the bonds to Haupt and to receive $948,821.33 from Haupt, and to send petitioner a refund of the "unearned interest". On December 3, 1957, Seneca advised petitioner about and sent him a refund of "interest" in the amount of $3,535.16, and sent him his cancelled note. The net amount of the "interest" paid to Seneca was $43,633.94, after another refund of $1,209.47. On his return for 1957, petitioner reported a long-term capital gain from this transaction in the amount of $22,656.25, computed as follows: Sales price (exclusive of interest)
$984,062.50
Cost (exclusive of interest): Cost
$961,093.75
Commission
312.50
961,406.25
$ 22,656.25
The prices at which Haupt acquired the bonds in December 1956 and at which Haupt bought the bonds in November, 1957, were the actual market prices *117 on the respective dates. The New York prime bank rate of interest was 4 percent from December 18, 1956, until August 6, 1957, at which time it was increased to 4 1/2 percent, and it continued to be 4 1/2 percent on November 25, 1957. The high and low prices at which the 1 7/8 percent bonds were traded during the period from December 1, 1956, to November 30, 1957, were 98-12/32 high, and 95-28/32 low. The bid and asked market prices for the same bonds were: Bid
Asked
12/13/56
96- 2/32
96- 4/32
11/22/57
98-12/32
98-16/32
Summary of Transactions On the basis of petitioner's net cash payments of the purported prepaid "interest" on his various notes, and the invoiced charges and credits, respectively, to him, and apart from considerations relating to possible income tax benefits, petitioner sustained a net cash loss on each transaction in the amount set forth below, which is explained hereinafter: Transaction
Net Cash Loss
1.
$ 7,789.04
2.
3,939.03
$11,728.07
3.
7,833.48
4.
4,791.65
5.
3,501.46
The following schedules provide the facts and figures establishing the amount of the loss on each transaction: Transactions 1 and 2.
Amounts Charged to Petitioner and Cash Paid.
$750,000 bonds, charged by Mill-
ridge
$ 732,450.31
Prepaid "interest"
36,241.25
Total charged to petitioner
$ 768,691.56
Credits to and Receipts by Petitioner.
Credited as "purchases" from peti-
tioner
$ 749,062.50
Interest on bonds accrued
655.22
Refunded by Millridge "prepaid
interest"
7,245.77
$ 756,963.49
Loss
$ 11,728.07
Transaction 3.
Amounts Charged to Petitioner and Cash Paid.
$500,000 bonds, charged by Mill-
ridge
$ 488,740.19
Prepaid "interest" (1956)
12,925.97
Prepaid "interest," additional
(1957)
1,763.13
$ 503,429.29
Credits to and Receipts by Petitioner.
Credited as "purchased" from peti-
tioner
$ 494,687.50
Accrued interest on bonds
908.31
$ 495,595.81
Loss
$ 7,833.48
Transaction 4.
Charges to and Payments by Petitioner.
$500,000 bonds, Haupt
$ 487,968.75
Accrued bond interest
82.42
Prepaid "interest", 1956
24,402.56
$ 512,453.73
Credits and Refunds to Petitioner.
Credit for bonds
$ 492,890.63
Accrued bond interest
635.25
Bond coupons matured, April 1,
1957
3,750.00
Refunded prepaid "interest", 1957
10,386.20
$ 507,662.08
Loss
$ 4,791.65
Transaction 5.
Charges to and Cash Paid by Petitioner.
$1,000,000 bonds, charges, Haupt
$ 961,406.25
Accrued bond interest
6,317.93
Prepaid "interest", 12/13/56
48,378.57
Additional bond interest accrued,
1956
152.85
$1,016,255.60
Credits and Receipts by Petitioner.
Credit for bonds
$ 984,062.50
Accrued bond interest
5,197.01
Bond coupons matured
18,750.00
Refunded prepaid "interest", 1957
3,535.16
Refunded prepaid "interest", 1957
1,209.47
$1,012,754.14
Loss
$ 3,501.46
*118 By engaging in each of the 5 transactions, petitioner decreased the amount of his income tax for 1955 and 1956 in the respective amounts of $30,710.88 and $65,454.57. The range of fluctuations in the market price of government bonds narrows down the longer the bonds are held because as the maturity date is approached, the market price is closer and closer to the par value of the bond. An issue of bonds purchased within a year and one-half of its maturity date generally would be subject only to minor market price fluctuations. In the matter of anticipated fluctuations in the market prices of Treasury bonds, it is the period of remaining time between the date of purchase and the maturity date that is relevant, rather than the period of time after the date of original issuance of the bonds. It was not common for the market price of Treasury bonds (of the type involved here) to fluctuate more than 1 or 2 points within 2 years of the maturity date, and fluctuations of 3 1/2 points would be the "optimum." The Treasury bonds involved here were not held in the periods of late 1957, 1958, and 1959, when there were some sharp fluctuations in market prices which were out of the ordinary *119 trend. Fluctuations in the market prices of government bonds depend, also, upon whether a particular issue was purchased at a price above or below par, as well as on the period of time involved between the date of purchase and the date of maturity; and they also would depend on whether the bonds were traded in an artificial market due to having some coupons detached. Ultimate Findings of Fact Transactions 1, 2 and 3: (1) In these transactions, the prices Millridge charged petitioner, as the "cost" or "purchase" price to him, on its invoices were artificial prices fixed by means of "detaching" 2 coupons from the bonds, or 1 year's bond interest, and did not reflect the actual market prices which petitioner would have had to pay for the bonds on the regular market. (2) Petitioner did not enter into these transactions with any realistic expectation of deriving economic gain, or of any appreciable gain in his beneficial interests. (3) Petitioner entered into each of these transactions with Millridge solely in an attempt to obtain the tax benefits of intended deductions of payments made as prepaid "interest." (4) Petitioner failed to prove that any of the 3 transactions with *120 Millridge had any purposive reason, or substance apart from providing a basis for a purported prepayment of "interest" for tax deduction purposes. (5) As a payment of interest, each of the 3 transactions of petitioner with Millridge was a "sham." Petitioner did not pay interest on indebtedness in 1955 and 1956 under these transactions within the purpose and meaning of section 163(a). Transactions 4 and 5: Petitioner's purpose in entering into the transactions with the National Security Bank and the Seneca Bank was not to derive any economic gain or to improve his beneficial interest; but was solely an attempt to obtain the tax benefits of the deductions for prepaid interest, in each instance. He entered into each of these transactions without any realistic expectation of economic profit. Opinion The question is whether the various amounts expended by petitioner as prepaid "interest" in each of the 5 transactions come within the scope of section 163(a), 1954 Code, as "interest paid * * * within the taxable year on indebtedness," so as to be deductible. A deduction of $36,241.25 is claimed for the taxable year 1955. This amount is the sum of the 2 payments in the first 2 transactions *121 which were made as prepayments of "interest" when each note was given to Millridge, as follows: Note dated 11/16/55, prepaid
"interest"
$23,301.37
Note dated 11/22/55, prepaid
"interest"
12,939.88
$36,241.25
A deduction for interest is claimed for the taxable year 1956 in the amount of $78,866.08. The parties have not provided a breakdown of this amount. The following provides a breakdown and shows payments of prepaid "interest" in 1956 in the total amount of $85,707.10. On September 27, 1956, Millridge made a refund of "interest" in the amount of $6,840.82 in closing transactions 1 and 2 (and made a further refund in 1957). The net amount of petitioner's payments of purported interest in 1956 is $78,866.28, which exceeds the amount of the claimed deduction by 20 cents, which discrepancy is not explained: 1956 Payments:
No. 3 transaction, to Millridge
$12,925.97
No. 4 transaction, to Nat'l Sec.
Bk.
24,402.56
No. 5 transaction, to Seneca
48,378.57
Total
$85,707.10
Refund by Millridge, No. 1 and 2
6,840.82
Net payments in 1956
$78,866.28
In all of the 5 transactions, and in each one, an order was placed with a broker or dealer *122 in securities to make a purchase on the market, at the market price, of United States Treasury bonds in a principal face amount, the differences being only in the series, or issue, of the bonds and the principal amount; the broker was instructed in each instance to deliver the particular bonds to a bank and to receive from the bank the payment of all or substantially all of the cost of the bonds; the bonds were held by the lending bank as security for the money advanced to the broker, and were so held for a period of more than 6 months. Eventually, each transaction was closed by similar steps: The broker was instructed to dispose of bonds on the market, at the market price; the bank was requested to make delivery of the bonds in its possession to the broker and to receive from the broker funds in payment of the bank's loan, or the balance thereof. The funds paid by the broker to the bank were the proceeds of the sale on the market of the bonds. Petitioner did not have control over the bonds in any of the transactions and none were ever delivered to him. In each transaction, Millridge or D. H. Blair & Co. made all of the arrangements with each bank involved for the payment of cash to *123 the securities broker, and for the pledging of the bonds with the bank, and for the eventual closing of each transaction through a sale by the broker, redelivery of the bonds to him, and the payment of funds by the broker to the bank. And, in addition, Millridge or D. H. Blair & Co. prepared the notes for petitioner's signature, which were part of the general procedure, and advised him about the detailed steps to be followed as far as he was involved. In each instance, petitioner signed a note and paid in advance as "interest" the amount of interest to accrue during the term of the note from the date thereof until maturity; and it was understood that if the bonds described in the note as the collateral were sold after 6 months and before the due date of the note, there would be refunded to petitioner an amount which would represent the "unearned" portion of the prepaid "interest". Such refunds were in fact made in a taxable year subsequent to the year in which petitioner made the payment of prepaid "interest." In each transaction, the principal amount of the bonds purchased on the market by a broker was large, and the amount paid by petitioner as prepaid "interest" was correspondingly *124 substantial. The claimed deduction for interest in 1955 and 1956, respectively, is for a comparatively substantial amount. The facts in each transaction have been set forth fully in the findings. There is no dispute about the basic facts and the steps followed in each instance. Necessarily, the facts in each transaction are detailed but the pattern of the steps followed is substantially the same in each one. Here, the petitioner had the burden of proving that the payments constituted interest on indebtedness within the scope of section 163(a). First, a few comments are made about the evidence adduced. The record comprises a large quantity of exhibits, grouped under each transaction to show the steps taken, brokers' invoices, notes executed, correspondence, written instructions, and some of the relevant accounting records. Petitioner testified, and each party called a witness acquainted with the market for government securities. Petitioner did not call upon any person to testify, employed by Millridge, D. H. Blair & Co., a bank, or a broker, so that there is no testimony about the arrangements made by Millridge, or Blair, of any bank or dealer in securities. Specifically, Robert Miller *125 and Hyman Federman were not called by petitioner to testify. Respondent, not having a burden of proof, did not have a responsibility in the matter of calling any witnesses. His witness, who testified about the market for government securities, was a rebuttal witness. The suggestion of the petitioner that the respondents' failure to call as witnesses any of those referred to above is without merit. Since petitioner had the burden of proof, the petitioner had the duty of calling third-party witnesses to testify about the transactions if such persons possesed information relevant to the issue here. "If any inference is to be indulged because of failure to call such witnesses, we think it must be against petitioner and not against the Commissioner." See Thomas E. Snyder Sons Co. v. Commissioner, 288 F. 2d 36, 39; Schoenberg v. Commissioner, 302 F. 2d 416, 420; and Meier v. Commissioner, 199 F. 2d 392. Transactions 1, 2, and 3 were entered into by petitioner with Millridge. In each transaction, Millridge purportedly sold bonds to petitioner with the bond coupons for 1 year's interest, 2 coupons "detached." That is to say, the price charged by Millridge *126 for the bonds in each instance was the price at which the broker acquired them on the market (under the order of Millridge), less the amount of the bond interest for 1 year. Comment is made now about this arrangement. This arrangement, which is not customary in ordinary purchases of government bonds, was a means by which Millridge purportedly "sold" the bonds to petitioner at a lower-than-market price, thereby providing petitioner with a lower cost basis when each transaction was closed and petitioner would compute his gain or loss. It is observed that it just happened that the maturity dates of each set of "detached" coupons were such that it would not be necessary to hold the bonds for 12 months from the date of the transaction between petitioner and Millridge in order to collect the coupon interest. (We need not specifically delineate the details, dates, and period of time involved in respect of each "set" of 2 bond interest coupons. The findings are clear on this aspect). Of course, a set of 2 coupons was not physically clipped from the bonds in each transaction on the date of a transaction with Millridge. There is no evidence to that effect; nor was it necessary to detach the *127 coupons because petitioner did not receive custody of the bonds. The word "detached", in these transactions, means only that Millridge could collect the interest as each of the 2 designated coupons matured, which Millridge did, applying the bond interest so collected to the payment and reduction of a loan of a bank (or securities broker) to Millridge. The following illustrates the mechanics of figuring the price of a "sale" of bonds by Millridge to petitioner. In the first transaction, Haupt & Co. acquired on the market, for a sale to Millridge, on November 15, 1955, $1,000,000 of 2 7/8 bonds due in 1957 at a market price above par, 100-20/32, for $1,006,250, exclusive of accrued interest. In the transaction with petitioner on the same date, Millridge charged petitioner, as a "sale" to him of $500,000 of the same bonds a price below par, 97-24/32, with 2 coupons "detached", bond interest for 1 year amounting to $28,750. For all practical purposes, this "detachment" of 2 coupons was tantamount to a "purchase" of the interest coupons by Millridge. In fact, in this instance, Millridge "charged" petitioner $380 as a discount. (Exhibit 6-F(b)). The following explains the price charged *128 to petitioner for $500,000 of bonds with 2 coupons detached: $500,000 of bonds at the market price paid by Haupt, 100-20/32 cost $503,125, principal, exclusive of accrued interest. One year's interest on these bonds amounted to $14,375. Millridge invoiced these bonds to petitioner at $489,130, on the basis of principal only without any charge for all of the accrued interest. This amount represents: $503,125
(97-24/32)
-14,375
$488,750
380
(discount charged by M.)
$489,130 The quoted market prices for these bonds on the same date was 100-16/32 bid, and 100-18/32 asked. It is clear that the procedure of charging petitioner a price computed on the basis of market price less 1 year's interest was a device to give the appearance of a purchase by and a cost to petitioner which would be below par and below the market. Otherwise, if petitioner had in fact made a bona fide purchase of the bonds on the market at the market price, he would have had to pay an above-par price. There is testimony here to the effect that the market price of government bonds tends to decline (if above par) to par (100) as the maturity date of the bonds is approached. It is also clear that *129 the purpose of this device was to enable petitioner to report on his return a capital gain, and thereby give the transaction some semblance of a purpose to realize a gain apart from a desire to obtain the tax benefit of a deduction for a prepayment of "interest" over the term of a note. In considering the first three transactions of petitioner, which were with Millridge, the fixing by Millridge of its charges to petitioner on the basis of "detaching" 2 coupons of bond interest is, of course, only one of the elements to be weighed in connection with all of the evidence relating to each transaction. In this case, however, the device of dealing in the Treasury bonds with 2 coupons detached throws much light upon the general question of whether petitioner engaged in these transactions for a real purpose apart from a desire to obtain the tax benefits of a deduction in a taxable year for a prepayment of all of the "interest" to accrue on a note during the term of the note. We deem it pertinent, therefore, to discuss at some length what it meant for Millridge to fix its charges to petitioner on the basis of "detaching" 2 coupons from each bond. We may anticipate the following discussion *130 by saying that resorting to this device constituted a means for charging petitioner an artificial price for the bonds. We accept as wholly credible the testimony that the detaching of coupons (such as 2 of them) from Treasury bonds makes the bonds nonmarketable during the period the coupons are detached, and prevents a "good delivery" of the bonds; that it is considered not to be good delivery and market practice to trade in government bonds of the type involved here with 2 coupons detached; and that such arrangement is not done by reputable dealers in government bonds and is outside the normal practice of the major dealers in government securities. A regular dealer in government securities will not buy government bonds with coupons detached because "good delivery" of a bond cannot be made on the market to others if coupons have been detached. Moreover, both Millridge and D. H. Blair & Co. are money brokers; they are not dealers in securities or in government bonds. We are satisfied that the witness, Sternlight, an employee of the Federal Reserve Bank of New York, an assistant vice president engaged in Federal Reserve Bank open market operations on the market in government securities, *131 was a well qualified witness to testify about the practices of dealing in government securities on the market, and that his knowledge and experience makes his testimony acceptable. His explanation of the handling of bond interest coupons is this: A bank, holding in its safekeeping a large quantity of securities which are handled for various customers, may detach from bonds one coupon, only, prior to its collection date, for the purpose of processing the collection of the coupon that is about to mature. Otherwise, it is not customary to detach coupons, such as 2 of them from a government bond and to deal in it with some of the coupons detached. On the record here, there cannot be any doubt at all that in the first, second, and third transactions, the arrangement by Millridge of charging petitioner for each lot of bonds on the basis of "detaching" 2 bond interest coupons for 1 year's interest was for the purpose of providing petitioner with a "cost" that was lower than the market prices at which the bonds were being traded, and, therefore, of providing him with an artifical "cost". The following facts are noted: Transactions 1 and 2 involved the same issue of bonds, 2 7/8 percent bonds *132 issued on September 15, 1953, and maturing on March 15, 1957. Both of these transactions were in November, 1955, which was 1 year and 4 months prior to the maturity date of these bonds. Transaction 3 involved 2 7/8 percent bonds issued December 1, 1955, and maturing June 15, 1958. This transaction was entered into 2 years and 2 months prior to the maturity date of the bonds. The following schedule shows market prices paid by Haupt & Co. and Sartorius to purchase the bonds on the market, and the price (less 2 coupons) that Millridge charged petitioner under its invoices: Millridge
Market
Charged
Transaction
Price Paid
Pet.
1. Bonds due 3/15/57
100-20/32(H)
97-24/32
2. Bonds due 3/15/57
100- 6/32(H)
97-21/64
3. Bonds due 6/15/58
99-33/64(S)
96-43/64 The device of "detaching" 2 coupons served the purpose of reducing the charge made by Millridge to petitioner by more than 2 points below the market price. The price charged by Millridge was close to but not quite 3 points under the market price, in each transaction. This enabled petitioner to have a cost of between 2 and 3 points below the market price. There is evidence here to the effect that as *133 the maturity date of a government bond is approached, the market price for the bond tends to narrow down towards the par value of the bond; and, also, that during the period which is close to the maturity date of the bond, there ordinarily is very little and only a small fluctuation in the market price of the bond. According to these well known price trends, since the bonds involved in transactions 1 and 2 were being traded on the market in November 1955 at prices above par, and since these bonds were to mature in 1 year and 4 months, the reasonable expectation in November, 1955, was that the market price of the bonds would tend to move close to par between November, 1955, and March, 1957. In the case of the bonds used in the third transaction, Sartorius bought them at close to par, at 99-33/64, and as the maturity date of those bonds approached (June 15, 1958) the trend of the market price could reasonably be expected to go only towards par. The following schedule shows the market prices at which the brokers, Haupt or Sartorius, sold the bonds involved, and the prices at which Millridge credited petitioner: Market Price
Millridge
Transaction
Sold by Broker
Credit to Pet.
1. Bonds due 3/15/57
9/26/56
99-28/32(H)
99-28/32
2. Bonds due 3/15/57
9/26/56
99-28/32(H)
99-28/32
3. Bonds due 6/15/58
1/ 7/57
98-31/32(S)
98-31/32
*134 The best evidence of the trend in the market prices for the 2 issues of Treasury bonds involved in these 3 transactions with Millridge consists of the actual market prices paid or received by Haupt or Sartorius in their respective dealings in these bonds, on the market, as shown above. Thus, only by the device used by Millridge in charging petitioner a price below the market (by detaching 2 coupons) could petitioner expect to realize any "gain" in the transactions in respect of the "cost" he would use for tax purposes. If he had used as his "cost" the actual market prices paid by the securities dealers of 100-20/32, 100-6/32, and 99-33/64, he would have had to report a loss on each transaction for tax purposes. The device of charging him a price based on detaching 2 coupons gave him an artifical "cost" of between 2 and 3 points below the market (97-24/32, 97-21/64, and 96-43/64), and enabled him to report a "gain" for tax purposes. In the fourth and fifth transactions, the maturity dates of the bonds involved were April 1, 1958, for the 1 1/2 percent bonds, and February 15, 1959, for the 1 7/8 percent bonds. The device of detaching 2 coupons was not used, and was not needed. The *135 device of detaching 2 coupons to "adjust" petitioner's "cost" was not deemed to be necessary. The 1 1/2 percent bonds maturing April 1, 1958 (transaction 4) were being traded on the market on October 5, 1956, at a price close to 3 points below par. Haupt bought them on that date at 97-19/32, and 7 months later on May 2, 1957, this transaction was closed by Haupt's buying the bonds back at 98-18/32 for close to 1 point more, but the maturity date of those bonds was closer in 1957 and a trend of the market price towards par could be expected. Similarly, in transaction 5, involving the 1 7/8 percent bonds due February 15, 1959, Haupt paid the market price of 96-3/32 on December 17, 1956. This transaction was closed 11 months later on November 25, 1957, when Haupt bought back the bonds at 98-13/32. It is petitioner's position that he entered into each of the 5 transactions for the purpose of realizing capital gain, and he so testified. He relies primarily on L. Lee Stanton, 34 T.C. 1. He argues that in each transaction there was a risk of loss, and that he realized gain because of fluctuations in market prices. He emphasizes the fact that in each instance the note that he *136 executed was a full recourse note. He contends that the notes were genuine evidence of indebtedness (which he had the assets to repay), that in each instance there was genuine indebtedness, and that his payments here in dispute must be regarded as interest paid on indebtedness within the scope of section 163(a). He argues that Joseph H. Bridges, 39 T.C. 1064, affd. 325 F. 2d 180, and similar cases, holding that disputed payments were not interest paid on indebtedness, are distinguishable. Petitioner's entire contention is that none of the transactions were a sham, that his beneficial interests were directly affected by engaging in them, and that he had some purpose other than to obtain tax deductions for prepaid "interest". Respondent's position is that none of the transactions involved the payment of interest on a real indebtedness of petitioner; that none of them appreciably affected petitioner's beneficial interest; and that in substance, the purpose of each one was none other than to "purchase" a tax benefit by means of paying large sums as prepaid "interest". Respondent involves the reasoning of Gregory v. Helvering, 293 U.S. 465; Knetsch v. United States, 364 U.S. 361; *137 Joseph H. Bridges, supra; Jockmus v. United States, 335 F. 2d 23; Williams v. Commissioner, 323 F. 2d 656, affirming a Memorandum Opinion of this Court; and Sammy Cahn, 41 T.C. 858. Respondent does not concede that any of the 5 transactions was real, valid, and bona fide, and he argues that the Stanton case is distinguishable. Since the parties filed their briefs, the following cases have been decided and consideration has been given to them: Goldstein v. Commissioner, 364 F. 2d 734, affirming, 44 T.C. 284; and Barnett v. Commissioner, 364 F. 2d 742, affirming, 44 T.C. 261. It is true, of course, that a taxpayer may decrease what otherwise would be the amount of his tax by means allowed by law, as has been recognized by the Courts since at least Gregory v. Helvering, supra. But the rules of Gregory and of Knetsch, supra, are that the reduction in the tax must be accomplished by a means which was intended by a statutory provision. See Joseph H. Bridges, 39 T.C. 1064. 1075-1076, supra; and J. George Gold, 41 T.C. 419, 426-427. Upon full *138 consideration of all of the evidence relating to each of the 5 transactions, our conclusion is that the petitioner has failed to prove that each of the payments in issue constituted interest on indebtedness within the meaning of section 163(a). Consideration is given first to whether each transaction did or did not appreciably affect petitioner's beneficial interest except to reduce his tax, and what the possibilities were in that regard. Knetsch v. United States, supra, p. 366; Bridges v. Commissioner, 325 F. 2d 180, 184, supra. In each transaction, the rate of the "interest" fixed in the notes executed by petitioner exceeded the yield, or rate of interest, on the Treasury bonds. The only possible source of profit on these transactions was an appreciation in the value of the bonds during the term of the note. For example, in the fourth and fifth transactions the rate of "interest" fixed in the note to National Security Bank was 5 percent, and the rate of interest on the note to Seneca was 5 percent. That interest rate was 1 percent higher than the then New York prime rate of interest, and the Treasury bonds involved paid only 1 1/2 percent and 1 7/8 percent *139 interest. In the first 2 transactions, the bond rate of interest was 2 7/8 percent, and the rate of interest on the notes to Millridge was 3 1/2 percent, and was increased to 4 1/2 percent. In the third transaction, the bond interest was 2 7/8 percent, and the interest on the note to Millridge was 4 percent and was increased to 4 1/2 percent. However, Treasury bonds are recognized as a stable security having very little fluctuation of market price in the period which approaches the maturity date. The price stability of the Treasury bonds here was an essential feature of the transactions. The bonds are usually purchased on a short-term basis at a few points below par, and the market price will tend to rise towards par over the term of the loan. The net result on resale of the Treasury bonds to discharge the loan is that the taxpayer-seller realizes a capital gain which will offset the loss he suffered on the interest differential, that is the amount by which the interest on the loan exceeded the interest yield of the bonds. Absent tax considerations, a taxpayer can expect to suffer a predictable economic loss which is controlled because he can sell the bonds and wipe out the loan *140 at any time a decline in the value of the collateral tends to detract from the potential tax benefit to be derived from a deduction for prepaid interest. The evidence here does not establish that when petitioner entered into each of the 5 transactions he could have expected, reasonably, that his economic beneficial interest would or could be affected appreciably; and it is our conclusion that petitioner could not have benefitted economically in any way from each transaction except through a tax deduction. See Joseph H. Bridges, supra, p. 1077. In the findings, "Summary of Transactions," schedules are set forth showing the net financial loss of petitioner in each transaction when his outlays for the socalled prepaid "interest" are taken into account. His net cash loss on the 5 transactions amounted to $27,854.66, as follows: Transaction
Net Cash Loss
1.
$ 7,789.04
2.
3,939.03
Total
$11,728.07
3.
7,833.48
4.
4,791.65
5.
3,501.46
Total net cash loss
$27,854.66
On the other hand, such net loss is more than offset if the claimed deductions for "interest" paid in 1955 and 1956 are to be allowed, because petitioner's net tax *141 benefits would amount to $30,710.88 for 1955, and $65,454.57 for 1956, a total tax benefit of $96,165.45. Comparison of the above net cash loss on the 5 transactions with the total tax benefit shows clearly the reason for entering into the transactions. Moreover, no risk of loss was present in these transactions when the tax benefit aspect is taken into account. Petitioner was bound to attain the desired tax results without any appreciable change in his economic beneficial interest. Another observation is relevant to complete the picture. In 1957, the bonds involved in transactions 3, 4, and 5 were sold. Petitioner received in 1957 a refund of prepaid "interest" in the amount of $10,386.20 from transaction 4; and he also received in 1957 refunds in transaction 5 of prepaid "interest" of $3,535.16, plus $1,209.47, or $4,744.63. Also, he reported as "capital gain" from transactions 3, 4, and 5 the amounts of $5,947.31 (the corrected amount), $4,921.88, and $22,656.25, respectively. Petitioner continued in 1957 to engage in the same type of transaction in Treasury bonds, and made a payment of prepaid "interest" on another such transaction in the amount of $44,711.63. That payment served *142 to offset the additional income in 1957, supra. Upon the basis of all of the evidence, it is obvious and clear that petitioner purchased tax deductions by engaging in the 5 transactions, 2 of them in 1955, and 3 of them in 1956, and by paying in each year large amounts of cash as prepaid "interest". We turn now to other aspects of the transactions. In the first two transactions, Millridge secured loans from banks under its own notes, and the banks held the bonds as collateral; and in the third transaction, Millridge used its own government bond purchase account with Sartorius, making the purchase on margin, and Sartorius held the bonds. In form, petitioner "borrowed" funds from Millridge in each instance and executed a note payable to Millridge. In fact, Millridge did not have the funds to loan to petitioner. The same bonds were the collateral for the loans to Millridge, as purportedly were the collateral for the alleged "loans" of Millridge to petitioner. Petitioner at no time had any control over each lot of bonds and did not receive any funds from Millridge. Looking through the nicely detailed form of each transaction, as between petitioner and Millridge, there were nothing *143 more than a paper transaction and bookkeeping entries. As far as the banks and Sartorius were concerned, each party involved advanced funds but held ample security for such advance, the bonds themselves, and each party received back its funds when the transaction was closed out of the proceeds of sales of the bonds on the market. The banks and Sartorius received a fee for their accommodations in the payments of interest for short-term advances of funds. But neither Millridge nor petitioner received funds from the banks or Sartorius. The money traveled from a bank to a dealer in securities, and from the dealer back to the bank. Thus here, as in typical cases, there was the usual "round robin" in which banks and securities dealers participated. See Broome v. United States, 170 F. Supp. 613 (Ct. Cl.). Another interesting element in this case is that Millridge did not even engage in the exactitude of identifying particular bonds as the ones involved in the transaction of petitioner; it did not segregate bonds purchased by a security dealer on the order of Millridge against the note to Millridge of a particular "customer" of Millridge. When the time came to close out a *144 transaction with petitioner (as between Millridge and petitioner) the bonds pledged with a bank by Millridge at the time petitioner executed a note to Millridge were not necessarily the bonds that were sold to obtain funds to discharge the advance of funds by the bank. Millridge would order the sale by a dealer of other bonds held by the bank and direct the application of the proceeds of the sale to discharge the bank loan obtained when petitioner executed a note to Millridge. The "other" bonds apparently had secured bank loans obtained by Millridge to finance similar transactions on behalf of other customers of Millridge. In other words, in the first two transactions, bonds were used by Millridge as fungible property, and Millridge merely credited petitioner on its books with the "purchase" of the bonds. And comparison of Millridge's Bond Purchase and Sales Journal with its Cash Receipts and Disbursements Journal does not disclose cash receipts and disbursements of Millridge even approximating the sums of money involved in its purported purchases and sales of Treasury bonds to petitioner. For example, there is no record in Millridge's cash receipts book relating to cash received from *145 Seneca at or about the time Millridge purportedly sold bonds to petitioner. The only inference is that in substance, Millridge never received the cash proceeds from Seneca, and that the cash flowed directly from Seneca to the dealer, Haupt & Co.
In the third transaction, Millridge used its government bond account with Sartorius and no principal amount of cash was used; Millridge did not receive a "loan" of money; Sartorius did not receive funds from a bank. In this instance, Millridge bought some bonds on "margin" under its open account with Sartorius. On its books, Millridge did not record the cash payment by petitioner of the so-called prepaid "interest." Millridge asked petitioner to put up $13,000 as "margin", and petitioner did so, and Millridge later refunded it to him. Petitioner made 2 payments to Millridge; $13,000 "margin", and $12,750.20, as prepaid "interest." Millridge's bond account with Sartorius was credited on April 16, 1956, with 2 amounts of cash payments, $15,200 and $10,000, or $25,200, close to petitioner's payments, and presumably Millridge simply channeled petitioner's payments of cash to Sartorius. Sartorius charged Millridge's margin account with $503,115.19. *146 Petitioner's payments to Millridge of $25,750.20 scarcely provided him with any "equity" in the $500,000 of bonds. Furthermore, the record here does not disclose any facts to show the basis on which Millridge supported its margin account with Sartorius. In any event, Sartorius at all times held the bonds in the third transaction. The plan followed in each of the first three transactions in issue here, as handled by Millridge and in the form and the steps taken, closely resembles the plan that was followed in the case of Max Barnett, supra, by the Gibraltar Financial Corporation. In Barnett, $750,000 of 3 3/4 percent Treasury certificates of indebtedness, due December 1, 1958, were involved. They were not purchased in Barnett's name but were purchased in the name of Gibraltar, and when sold, were sold in Gibraltar's name. Gibraltar never had possession of the certificates; they passed from a securities dealer, First Boston Corp., to a bank's correspondent bank, or agent, where they were held until the transaction was closed by a sale on the market through another dealer in securities, C. J. Devine & Co., who paid the sale proceeds to the bank involved. This Court applied the principle *147 that "the transaction must be considered as a whole and could not be fragmentized" (44 T.C. 261, 276). We pointed out that "Gibraltar, the alleged lender of funds to petitioner, had no money and it did not forbear or permit the use of its money as a result of the round robin in which the banks, Cleveland Trust and Irving Trust engaged. Cf. Broome v. United States, supra, [170 F. Supp. 613]." (44 T.C. 261, 277). In Barnett, in the transaction between the taxpayer and Gibraltar, "Gibraltar provided the service of providing color and form for petitioner's claim for a deduction for alleged interest, and received a 'commission' for its services." (p. 280). We concluded (pp. 280-281) "that there was nothing of substance to be realized by petitioner from the transaction in question without regard for and except for the tax deduction - the favorable tax consequences. * * * petitioner did not have and could not reasonably have had any purpose or intention, in entering into the transaction, to appreciably affect his beneficial interest except to reduce his taxes." We made the ultimate finding that "as a payment of interest, the transaction of petitioner *148 and Gibraltar was a sham," and that Barnett's payment was not interest on indebtedness within the meaning of section 163(a). In its affirmance in the Barnett case, the Court of Appeals (C.A. 2) concluded (as we had done) that the taxpayer "could not have expected to realize a profit on the transaction and that the transaction had no purpose, utility, or substance apart from the tax consequences petitioner anticipated it would have. * * * Moreover, * * * the nature of the diaphanous arrangement between petitioner and Gibraltar (as differentiated from the arrangement between Gibraltar and the various financial institutions Gibraltar involved in its financial 'round robin') * * * lead us without * * * doubt to conclude that * * * the purported loan transaction * * * was a 'sham' of the discredited Goodstein variety." In this case, there are no substantial differences between the 3 Millridge transactions with Lifschultz and the transaction between Gibraltar and Barnett. We find no real distinction of the Barnett case, supra, from this case in respect of the first 3 transactions; therefore, we arrive at the same conclusions, namely, that here the first 3 transactions, namely, that here *149 the first 3 transactions, those between Millridge and petitioner, had no purpose, utility, or substance apart from the tax consequences which petitioner anticipated they would have; petitioner could not have expected to derive from them any appreciable economic benefit; and deductions cannot be allowed under section 163(a) for petitioner's payments that were made in the form of prepaid "interest". Moreover, as in Barnett, it is concluded that each of the first 3 transactions was a "sham" and was without substance for tax purposes. It is held that a deduction for interest on indebtedness in 1955 in the amount of $36,241.25 (transactions 1 and 2) is not allowable under section 163 (a), and that a deduction in 1956 of $12,925.97 (transaction 3) is not allowable as interest paid on indebtedness. There remains for determination the questions about the payments made by petitioner in 1955 under transactions 4 ($24,402.56), and 5 ($48,378.57). (Of course, the deduction in issue for 1956 is the net amount of $78,866.08.) In the fourth and fifth transactions, petitioner in form secured loans from banks and executed a note payable to each one in the amount of the purchase price of the bonds, *150 but Millridge made all of the arrangements. Haupt & Co., was the dealer in each instance. Funds were channeled from each bank to Haupt, and back from Haupt to the bank; and Haupt delivered bonds to the bank, and later the bank returned the bonds to Haupt. The banks collected bond interest coupons which matured and kept the proceeds in reduction of their advances of funds to Haupt. Our conclusion is that petitioner has failed to prove that he entered into fourth and fifth transactions with any realistic expectation of deriving any economic gain or of improving his beneficial interest. It is concluded that petitioner's purpose in entering into the National Security Bank and the Seneca Bank transactions was solely in order to obtain the tax benefits of large interest deductions. It is concluded, further, that the fourth and fifth transactions had no substance or purpose apart from petitioner's desire to obtain the tax benefits of the deductions claimed for prepaid interest. Petitioner had the burden of proof. He failed to prove that when he entered into each of these transactions there was any realistic expectation of economic profit, or any realistic expectation that there would *151 or could be an appreciation in the market prices of the 1 1/2 percent and 1 7/8 percent bonds, due April 1, 1958, and February 15, 1959, respectively, which would or could make up for the unfavorable differential between the 5 percent interest he paid on his notes to the banks and the 1 1/2 percent and 1 7/8 percent interest yield of the bonds. We here follow our reasoning in Kapel Goldstein, 44 T.C. 284, 299-300, supra. Here, as in Goldstein, it appears to us that each transaction by each bank, Seneca and National Security, represented in substance and reality, an investment by the bank in the Treasury bonds, wherein the bank, in consideration for prepayment to it of "interest" by a customer, the petitioner, (at a higher rate than that yielded by the Treasury bonds), would carry the bonds in the customer's name as purported collateral for the "loan." That would lend a semblance of color to any assertion of the customer that he was indebted to the bank, and that what he paid to the bank was interest, deductible for Federal income tax purposes. But we do not believe that there would be any genuine indebtedness, under such circumstances, between the bank and its customer, *152 and if it is necessary to characterize the customer's payment, we would say that it was a fee to the bank for providing the "facade" of a "loan" transaction. Cf. Knetsch v. United States, supra. In the fourth and fifth transactions, as in the others, petitioner's transactions with the 2 banks could not appreciably affect his "beneficial interest" in any way except to reduce his income tax. If saving income tax for the taxable year involved, 1956, was the only significant benefit to be derived by petitioner (and our conclusion is that such was the only significant benefit), then the Knetsch, Bridges, and Goldstein cases require that the deductions for so-called prepaid interest must be denied. The respondent's determinations are sustained. Rule 50 computations are required, however, because of stipulations of the parties disposing of other determinations of the respondent which no longer are in issue. Decision will be entered under Rule 50. Footnotes
1. Very few facts have been stipulated. Under a stipulation of facts, the parties introduced in evidence 100 joint exhibits relating to the 5 transactions in issue.↩
2. Actually, Haupt sold Millridge on November 15, 1955, $1,000,000 2 7/8 percent bonds at 100-20/32 for $1,006,250, plus accrued interest, $4,817.99, or $1,011,067.99. Millridge made the purchase through Haupt in connection with both the first transaction in issue here of petitioner, and the transaction for David J. Brown, $500,000, each, or a total of $1,000,000 of bonds, with all of the coupons attached.↩